## ]UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**EZECHIEL PICARDEL,**

    **Plaintiff,**

    **v.**                                              **Case No. 19-CV-1180-SCD**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    **Defendant.**

---

### DECISION AND ORDER

---

In 2016, Plaintiff Ezechiel Picardel applied for disability insurance benefits, alleging that he became disabled in December 2014. After a July 2018 hearing before an administrative law judge (ALJ), the ALJ denied the claim for benefits. The Appeals Council denied the plaintiff's request for review in June 2019. Picardel now appeals. For the reasons given below, the Commissioner's decision will be remanded for further proceedings.

### BACKGROUND

The plaintiff was forty-four years old at the time of his disability hearing. His disability claim rests largely on his diagnosis of cyclic vomiting syndrome, known as CVS. This condition, which is associated with migraines, causes bouts of vomiting that are unpredictable in both occurrence and duration. At his hearing, Picardel testified that prior to being struck with CVS, he had a lengthy career as a bilingual technical trainer for high-speed packaging equipment. R. 37.[1] Often, he would fly around the country to various manufacturers to train

---

[1] The administrative record may be found at ECF No. 11-3 through ECF No. 11-15.

their staffs how to repair motors, valves, and other parts of the machinery. R. 38. In his final year with his employer, 2015, he used significant amounts of short-term disability leave while he and his doctor "were trying to figure out what was wrong with me." R. 38. He would work "off and on" — a week or two—and then he'd miss a few days, and so on. R. 39. Eventually his employer was unwilling to continue his employment on that basis.

Picardel testified that he has severe nausea and vomits "quite often." R. 40. The medication he takes for his condition "will knock me out when I start taking it. And, sometimes I'll be out for a few hours." R. 40. He stated that his doctor told him to re-take the medication if he still felt sick upon waking, which meant "there's times when I'm sleeping all the days away." R. 40. Picardel testified that the condition had begun about eight years earlier, which he initially attributed to alcohol use, and then cigarette smoking, both of which he quit. R. 41. Nevertheless, he "kept getting sick and it progressively got worse and worse and worse." R. 41. He stated that on a trip to South America, he was hospitalized for a week. Eventually, he also got sick while traveling in Dallas and Pennsylvania, at which point his doctor restricted him from traveling at all. R. 41. Restricting travel did not seem to help, however. He stated that he could be having a great day but then "out of the blue just get sick and start vomiting and end up having to take the medications that they want and that's the end of my day." R. 41-42. "From one day to the next, I have no idea what my situation is going to be." R. 42. He testified that triggers included stress, traveling, certain food, temperature, and overexertion. R. 42. When a bout of vomiting comes on at night, he said that he wakes up, starts gagging, and immediately takes his medication, after which he might vomit for forty-five minutes. R. 43. A "best case" scenario would be that he could return to normal after about four hours. R. 44. The worst-case scenario would last up to two weeks, although it had been about two years

2

since he'd experienced an episode that bad. R. 44. He stated that his wife told him she can hear him gagging in his sleep. R. 43.

Picardel testified that the episodes occur about eight to ten times per month, which he could usually "fight" with the medications. R. 44. The episodes were often accompanied by migraines, which caused painful headaches and sensitivity to light. R. 45. Picardel testified that, in addition to his prescribed medications, when he got really sick, "the only thing that keeps me out of the ER is butane hash oil." R. 46. When pressed by the ALJ for an explanation, he stated that the oil helps with nausea, and "within an hour I can function." R. 47. Picardel further explained that during an episode, he would spend anywhere from four to eight hours in the bathroom, and on bad days his family has to help him with everything, including feeding. R. 48.

A vocational expert (VE) testified at the hearing. In response to the ALJ's first hypothetical question, which included restrictions based on exposure to heat or humidity and exposure to moving mechanical parts, the VE stated that such an individual would not be able to perform the plaintiff's past work. However, such an individual could perform other jobs at the medium exertional level, including hospital cleaner, counter supply worker, and store laborer. R. 51. In response to the ALJ's question, the VE indicated that there would be no available jobs for someone who would miss two or more days of work per month or be off-task in excess of twenty percent per day. R. 52.

The ALJ issued a written decision on November 9, 2018. R. 15. He found that the plaintiff had severe impairments of cyclical vomiting syndrome, obstructive sleep apnea, and migraines. R. 17. He further addressed the plaintiff's anxiety, finding it non-severe because it caused no more than mild limitations in any functional areas. R. 19. In addition, the ALJ

found that Picardel retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels with the following restrictions: no exposure to extreme heat or humidity or workplace hazards, and no commercial driving. He would also need the ability to be off-task up to ten percent of the workday, in addition to regular breaks. R. 19.

In making this determination, the ALJ concluded that the medical evidence was not entirely consistent with Picardel's testimony regarding the limiting effects of his condition. For example, the ALJ noted, it had been two years since the plaintiff had experienced a severe CVS episode (one lasting for two weeks). R. 23. The record also indicated improvements in his conditions due to medications and lifestyle changes, although at other times there was no improvement. R. 22. The ALJ also gave "some weight" to the opinion of Samantha Melroy, an advanced practice nurse prescriber (APNP), who had treated and diagnosed the plaintiff's CVS. R. 23. Melroy had concluded that the plaintiff could work "[e]xcept during episodes of CVS." R. 23. However, the ALJ noted that Melroy was not an "acceptable medical source" and had opined on a matter reserved for the Commissioner. R. 23. The ALJ gave "great weight" to the state agency medical consultants, who opined that the plaintiff had no exertional limitations. R. 23. The ALJ also considered another treating source APNP, Casey Fisher, who among other things found that the plaintiff was incapable of performing the demands of sedentary or light work due to his episodic nausea and vomiting. R. 23. Again, the ALJ ascribed "some weight" to this opinion but found no justification for concluding that the plaintiff was incapable of sedentary or light work given that nothing in the medical record supported exertional limitations due to CVS. R. 24. In addition, the ALJ noted that Fisher "is not a medical or vocational source and the question of whether an individual is unable to work is reserved for the Commissioner." R. 24. Ultimately, the ALJ found that the plaintiff

4

could perform significant numbers of jobs in the national economy, and from that the finding of no disability followed.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by

substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

There seems little dispute that no individual is able to work while in the throes of a vomiting episode. Nor does there appear to be any dispute that an individual would be unable to work while taking medications that are heavily sedating. The question presented, then, is whether substantial evidence supports the ALJ's (implicit) conclusion that the plaintiff's CVS attacks were insufficiently frequent to cause absenteeism or to require him to be off-task more than ten percent of a workday.

6

## I.    APNP Fisher's Opinion

Picardel first argues that the ALJ erred in essentially rejecting the opinion of Casey Fisher, APNP. In February 2017 Fisher provided a brief "to whom it may concern" letter recommending that the plaintiff not travel due to CVS. The letter also noted that his medications may cause fatigue and an inability to drive or perform job duties. R. 669. The same month, Fisher checked a box on a form sent her by Unum insurance company. It asked whether Picardel was able to perform "light work" on a full-time basis with frequent sitting and occasional standing, walking, or travel. R. 670. Fisher checked the "no" box and signed the form. In September 2017 Unum followed up with Fisher, asking whether Picardel could perform sedentary or light work. Again, Fisher answered "no" and explained that Picardel suffered from episodic nausea and vomiting. R. 682. She also attached a note explaining that Picardel's CVS was characterized by "recurrent episodes of nausea and vomiting necessitating both emergency room visits and hospitalizations. These episodes can last up to a week and be quite debilitating. . . . It would be impossible to predict these episodes as they usually occur 'out of the blue.'" R. 683.

As noted earlier, the ALJ gave Fisher's opinion "some" weight, but he appeared to discount it on the basis that there was no evidence that CVS would impact the plaintiff's ability to lift, carry, sit, stand, or walk. In other words, the ALJ appears to have given Fisher's opinion less weight because he did not agree that the plaintiff would require exertional limitations. It is true that the record does not support any generally applicable exertional restrictions during periods when the plaintiff is *not* experiencing a bout of CVS.  In context, however, that does not provide a sound basis for giving less weight to Fisher's opinion. The form Fisher filled out specifically asked about Picardel's ability to perform both sedentary and

7

light work, and she checked the "no" box for both. It seems obvious from the context that Fisher was not specifically ruling out categories of work *because* they required certain exertional levels; she was simply saying "no" to *any* work, period, given Picardel's episodic vomiting and nausea. In other words, the record does not suggest that Fisher was offering any opinion about any exertional limitations at all. Therefore, the ALJ's observation about the absence of exertional limitations was, at best, tangential to Fisher's opinion regarding Picardel's capabilities.

The ALJ also discounted Fisher's opinion on the basis that she offered an opinion on a question reserved to the Commissioner, i.e., that Picardel was unable to perform sedentary or light work. R. 24. It is true that the ultimate question of disability (a legal question) is reserved to the Commissioner, but here Fisher was simply answering a *medical* question about whether Picardel had the physical capacity to perform sedentary or light work, as defined by the Unum insurance company (not federal regulations). "Whether a claimant qualifies for benefits is a question of law, but a medical opinion that a claimant is unable to work is not an improper legal conclusion. Indeed, ALJs must consider medical opinions about a patient's ability to work full time because they are relevant to the RFC determination." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (citations omitted). Accordingly, that the issue involved a question reserved to the Commissioner was not a sound basis to give less weight to Fisher's opinion.

Finally, the ALJ noted that Fisher was not a "medical or vocational source." R. 24. It is not clear what the ALJ meant by that, given that an advanced practice nurse prescriber is a "medical" source. Likely the ALJ simply meant she was not an "acceptable medical source," a term of art in the regulations. "For an application filed prior to March 27, 2017, neither a

8

nurse practitioner nor an APNP qualifies as an 'acceptable medical source' that can be considered a 'treating source' capable of receiving controlling weight." *Rivera-Capeles v. Saul*, No. 18-C-1286, 2019 WL 4635662, at *3 (E.D. Wis. Sept. 24, 2019) (citing 20 C.F.R. § 416.902(a)).

First, although APNPs are not acceptable medical sources on their own, it is not clear that an APNP working in consort with a physician would be considered non-acceptable. Here, the APNP participated in office visits and collaborated with the plaintiff's gastroenterologist, who wrote, "I saw and discussed this patient with my nurse practitioner Casey Fisher and agree with her findings and plan." R. 673, 653. *Taylor v. Comm'n of Soc. Sec. Admin.*, No. 10–35732, 2011 WL 5084856, at *4 (9th Cir. Oct. 27, 2011) (internal quotations omitted) (If a nurse practitioner is "working closely with, and under the supervision of" a physician, the nurse practitioner's "opinion is to be considered that of an acceptable medical source."); *Palmer v. Colvin*, No. 5:13-CV-126-BO, 2014 WL 1056767, at *2 (E.D.N.C. Mar. 18, 2014) ("[I]f the facts of treatment show the primary caregiver is a non-acceptable medical source, such as a nurse practitioner, and a doctor adopts the findings and information about the patient and is engaged in the treatment, the nurse practitioner's evaluation becomes the report of the doctor.") Whether or not nurse practitioners working in collaboration with physicians are treated as acceptable sources in this circuit (it is unclear), at a minimum the ALJ should have recognized that Fisher was working in collaboration with an acceptable medical source, indeed a specialist in gastroenterology, rather than relying solely on her own opinions.

In any event, assuming Fisher was *not* an acceptable medical source, that simply means her opinion cannot be afforded *controlling* weight. The opinion cannot be rejected simply on the grounds that it comes from a non-acceptable medical source. *Olson v. Colvin*, No. 12-CV-

9

591-WMC, 2014 WL 4792117, at *3 (W.D. Wis. Sept. 24, 2014) ("[T]he ALJ provides no further explanation as to why Anzak's opinion was discounted because of his status as a non-acceptable medical source. For instance, there is no real discussion of the length or frequency with which Olson saw Anzak.") Instead, the regulation directs ALJs to consider opinions like Fisher's:

> [A]n opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96–2p....

SSR 06–3p, 2006 SSR LEXIS 5, at *12–13 (Jan. 1, 2006).

Here, the medical record reflects five visits with Fisher over a two-year period. The most recent treatment notes indicate in January 2017 that there had been an increase in CVS symptoms over the prior six months, with "nausea occurring 3-4 days per week despite phenobarbital 30mg PO qid. He has not tolerated amitriptyline, nortriptyline, cyproheptadine and Topamax in the past." R. 677. Six months earlier he had been doing better. Even so, at that time he reported episodes 1-2 times per week, "though mostly only nausea at this point, since he has been able to successfully abort with Zofran, Imitrex, Benadryl, Ativan and/or compazine suppository." R. 656. He was also taking phenobarbital four times daily as a prophylactic. R. 657. Prior to his March 2016 visit, Picardel was experiencing 3-4 days per month with nausea/vomiting. R. 622. This was roughly consistent with what he had reported at his previous visit in December 2015. R. 622.

10

Thus, at his very best during this two-year period under Fisher's care, Picardel was experiencing nausea 1-2 times per week, which would amount to 5-10 times per month. Each time he experienced nausea, he apparently had to engage in a routine involving a number of abortive medications, including Imitrex nasal spray, Zofran, Ativan, and/or Benadryl, in order to head off a full-blown vomiting episode. These drugs were taken in addition to the phenobarbital he took as a prophylactic. Picardel points out that phenobarbital is a barbiturate that works as a sedative, and he testified that the abortive medications also "knock him out," R. 40, which Fisher had also confirmed. R. 669.

Thus, in order to meaningfully discount Fisher's conclusion that the plaintiff was unable to work, the ALJ would have had to explain how, in the best of times, Picardel would be able to hold a job while experiencing nausea 5-10 days per month and taking several sedating medications to prevent full-blown CVS episodes. In worse times, which were more frequent, Picardel would be experiencing nausea *and* vomiting episodes several times per month, on top of the sedating effects of the medication. It is difficult to see how this condition would not result in significant absenteeism on its own, even without considering the sedating effects of the medication. In fact, this is exactly what happened at Picardel's last job, where he could work up to a few weeks at a stretch and then would need time off, a situation the employer ultimately refused to tolerate. In any event, the ALJ did not adequately explain why APNP Fisher's opinions, given in consultation with the treating gastroenterologist, as well as the medical record suggesting substantial and continuing CVS episodes, did not support a finding of disability. That she opined on an issue reserved to the Commissioner or was not an "acceptable medical source" are not sufficient to discount Fisher's opinion that the plaintiff was unable to work.

11

## II.    Accommodating Picardel's CVS

Based on the medical record and testimony, it was clear that the plaintiff needed some kind of accommodation for his episodes of nausea and vomiting. The ALJ agreed, imposing the following limitations:

> The undersigned limited the claimant to work with no commercial driving and no exposure to extreme heat, extreme humidity or workplace hazards, such as moving mechanical parts and unprotected heights due to his allegations that heat, humidity and traveling can trigger his CVS symptoms. Additionally, the claimant is permitted to be off task for up to 10% of the workday in addition to regularly scheduled breaks to account for the unpredictable nature of his symptoms, including nausea and vomiting, and the potential need for additional restroom breaks. Further restrictions are not warranted based on the claimant's ongoing improvements with his physical impairments due to conservative medication management treatment.

R. 24. Based on the above, it appears that the ALJ's principal means of accommodating the plaintiff's CVS was to include an off-task allowance of up to 10% of each workday. However, this kind of across-the-board limitation misses the mark because it treats the plaintiff's CVS as something of a predictable daily hinderance rather than the more episodic, all-or-nothing disease that the record suggests. Based on Picardel's testimony and the other medical evidence, the plaintiff either feels fine, in which case he could work a normal workday without needing *any* off-task time, or he experiences a CVS bout that could take him out of commission for several hours or even days. He might have stretches lasting weeks with no trouble, but then have a bout arise unexpectedly and take him out for two days. Notably, the phrase "out of the blue" is found in the record in at least two different places. R. 42, 683. In other words, CVS is not the kind of disease that parcels out its anguish in predictable increments every day, it is one that would be expected to completely decommission the plaintiff for a few days or half-days per month, even though he might be fully able to perform "100% on-task" on the majority of days.

12

Additionally, the ALJ noted that the 10% off-task allowance would accommodate the plaintiff's nausea and vomiting and the potential need for additional restroom breaks. R. 24. But, as recounted above, a bout of CVS does not mean the plaintiff would simply need to use the restroom for ten minutes and then would be fine. Instead, upon experiencing nausea symptoms, the plaintiff begins a medication regime that essentially sedates him for a period of hours or longer. Ultimately, it seems highly unlikely that a 10% off-task allowance would accommodate the vagaries of the plaintiff's condition and/or medication regime. *Finzel v. Colvin*, No. 15-C-98, 2015 WL 4877412, at *5 (E.D. Wis. Aug. 14, 2015) (noting "the ALJ failed to explain how he came up with the [ten percent] percentage, which happens to correspond to the maximum off-task time an employer would tolerate.")

The analogy to other episodic conditions, such as migraines (which the plaintiff also suffered), is quite close. In *Krevs v. Saul,* for example, the ALJ also imposed a ten-percent limitation without explaining how it would actually accommodate the claimant's migraines:

> The nature of the ten percent limitation is unclear. Is it the ALJ's conclusion that Krevs's migraines may incapacitate him for up to 48 minutes of a workday—that is, ten percent of a normal eight-hour workday? Or has the ALJ rejected the evidence that Krevs is periodically incapacitated by migraines and, thus, could continue to work despite his migraines and other cognitive impairments, but at a ten percent slower rate? Krevs testified that his migraines might incapacitate him for days at a time. For example, he testified that the week before the hearing he suffered migraines so severe that he had to be hospitalized for two days because of the severe vomiting that resulted. (Tr. 166.) The ALJ failed to offer a sufficient reason to discount this and similar evidence.

No. 18-CV-1742, 2020 WL 58068, at *3 (E.D. Wis. Jan. 6, 2020); *see also Meyer v. Colvin*, No. 14-CV-813-JDP, 2015 WL 7738394, at *2 (W.D. Wis. Dec. 1, 2015) ("The ALJ included in the RFC the limitation that Meyer would be off-task no more than 10 percent of the workday because of headaches. But the ALJ did not explain how being off-task up to 10 percent of the workday would accommodate the effects that Meyer attributed to her migraines.") In sum,

13

because the plaintiff's disease is not a daily phenomenon, an allowance for being off task every workday does not meaningfully accommodate his condition.

Finally, although the ALJ also imposed limitations regarding factors like extreme heat and humidity, there is little evidence that avoidance of these potential triggers would meaningfully limit the plaintiff's CVS episodes. The plaintiff testified that the episodes come "out of the blue," and even stated that his wife can hear him gagging in his sleep. R. 41-43. He stated that he would wake up gagging and then immediately take his medication; even with the medication, however, he might need to vomit for forty-five minutes. R. 43. Thus, although he did say that there were triggers, including travel, the evidence also suggests the CVS episodes were largely unpredictable. As Nurse Fisher wrote, "it would be impossible to predict these episodes as they usually occur 'out of the blue.'" R. 683. In sum, the ten percent off-task accommodation, as well as restrictions based on humidity, heat, and workplace hazards, do not seem meaningfully to accommodate the realities of the plaintiff's condition.

## CONCLUSION

For all the foregoing reasons, the decision of the Commissioner is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for reconsideration of both APNP Fisher's opinion and the question of whether any workplace limitations would meaningfully accommodate the plaintiff's condition. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 10th day of July, 2020.

STEPHEN C. DRIES
United States Magistrate Judge

14